IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAQUELYN L., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | No. 19 C 4223 |
| v. ) | |
| ) | Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
|     Defendant. ) | |

### MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Jaquelyn L.,[3] applied for Disability Insurance Benefits ("DIB") in July 2016, when she was 63 years old, alleging a disability onset date of January 1, 2015 (R. 201), which was amended to April 1, 2016. (R. 220.) In May 2018, the Administrative Law Judge ("ALJ") issued an opinion finding Plaintiff not disabled. The Appeals Council denied review (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On August 21, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 12.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court abides by IOP 22 subject to the Court's stated concerns.

Cir. 2021). Before the Court are Plaintiff's memorandum seeking remand of that decision (D.E. 19) and the Commissioner's motion to affirm. (D.E. 26.)

## BACKGROUND

I.  **Administrative Record**

In March 2015, Plaintiff visited the emergency room ("ER") complaining of severe abdominal pain; at that time, she was diagnosed with diverticulitis.[4] (R. 464-67, 474.) In June 2016, Plaintiff returned to the ER complaining of abdominal pain, rectal bleeding and bloody stools. (R. 1153.) Plaintiff reported that she had suffered sharp lower abdominal pain and constipation alternating with diarrhea and blood in her stool multiple time a day for the last year, but she had been unable to pursue treatment for this because she had lost her health insurance and she was the primary caregiver for her 6-year-old granddaughter. (R. 1161-63.) The hospital performed an endoscopy, which found a large obstructing irregular mass in the upper rectum area; biopsies were taken but the scope could not pass beyond the mass. (R. 1148; 1160-61.)

On July 26, 2016, imaging confirmed that Plaintiff's rectal tumor was malignant. (R. 431.) On July 28, she established care with an oncologist, Leela N. Rao, M.D., to pursue treatment options for stage 3 rectal cancer. (R. 508.) The plan was for Plaintiff to undergo chemoradiation five days per week for approximately five and a half weeks to help downsize the tumor, to be followed by surgical resection. (R. 543.) On August 3, Plaintiff started chemoradiation, but on August 9, she went to the ER with vomiting, abdominal pain and bloody stools. (R. 512-15, 620-27.) Chemoradiation was put on hold, and on August 13, she underwent a diverting colostomy

---

[4] Diverticulitis is when an individual has tiny pouches, or diverticula, in the colon and the pouches get infected. https://www.hopkinsmedicine.org/health/conditions-and-diseases/diverticular-disease.

(surgery connecting her colon through a hole in the abdominal wall to a bag outside her body to collect waste).[5] (R. 628.) Plaintiff was discharged on August 18. (R. 631.)

Eventually, Plaintiff restarted chemoradiation, which was completed on September 29, 2016. (R. 797.) That month, an aide began coming to Plaintiff's home, 10 hours per week, to help her with activities of daily living ("ADLs") including meal prep, shopping, household chores and transportation. (R. 1101-124.) Plaintiff also began receiving regular home visits from social worker Karla Schwartz, M.S.W. Ms. Schwartz observed that Plaintiff's affect was flat and her mood was depressed and irritable; she diagnosed Plaintiff with major depressive disorder, recurrent, moderate. (*Id*.) On December 2, Plaintiff followed up with Dr. Rao, and on December 5, she underwent low anterior resection surgery (removing the part of the rectum containing the tumor and reattaching the colon to the remaining part of the rectum).[6] (R. 680-82.) Plaintiff was discharged December 9; her colostomy bag was still attached. (R. 711.) That month, a non-examining state agency consultant opined that Plaintiff's rectal cancer was "non severe" because it did not meet the duration requirement of 12 months from her alleged onset date. (R. 100-01.)

On January 5, 2017, Dr. Rao wrote that despite the surgical wound having healed, Plaintiff continued to have a "painful sensation deep in her pelvis and perineum. Her appetite is poor, and she is not eating much. She has lost weight. She is starting to feel depressed, and overwhelmed. She [had] an accident with her colostomy and this has distressed her." (R. 795.) Dr. Rao prescribed Wellbutrin for Plaintiff's depression. (R. 796). On examination, Dr. Rao found no sensory or motor deficits and normal range of motion ("ROM"). (*Id*.) On January 16, Plaintiff began scheduled chemotherapy (R. 868), and on January 20, she told Ms. Schwartz that the chemotherapy was

---

[5] https://www.mayoclinic.org/tests-procedures/colectomy/multimedia/colostomy/img-20007593.

[6] https://www.hopkinsmedicine.org/kimmel_cancer_center/cancers_we_treat/colorectal_cancer/about_rectal_cancer/treatments/surgery.html.

3

making her nauseous, tired and weak. (R. 1116.) Plaintiff was also feeling very overwhelmed with caring for her granddaughter. (*Id*.) Ms. Schwartz reminded her to take her antidepressant daily as prescribed because Plaintiff reported being noncompliant. (*Id*.) On January 30, Dr. Rao noted Plaintiff had mild nausea and no vomiting from chemotherapy, but she had cold paresthesia (numbness, tingling) for four days. (R. 868.)

In a Social Security function report dated January 24, 2017, Plaintiff wrote that chemotherapy made her bones sensitive, her "hands tingle, hurt[] when exposed to cold," and her fingers and hands were stiff and cramped. (R. 308.) Further, she wrote that her "balance is unstable," she had "dizzy spells," and she spent the majority of the day sleeping because she felt tired and drained. (R. 308-09.) An aide came to her home to make breakfast and pack a lunch for her granddaughter, and either Plaintiff's daughter or the aide prepared meals, washed clothes, grocery shopped, and escorted Plaintiff to doctor appointments or brief shopping trips for basic needs like toilet paper and soap. (R. 309-12.) Her daughter combed her granddaughter's hair and braided and washed Plaintiff's hair. (*Id*.) Plaintiff could dust or fold clothes so long as she was sitting down to avoid dizziness and did not lift anything over five pounds. (R. 310, 317.) She used a chair in the shower and had to get up slowly due to dizziness and balance issues. (*Id*.)

On February 13, 2017, Plaintiff told Dr. Rao she was feeling very down; she had back and knee pain, as well as nausea and chest tightness. (R. 868.) On February 17, Dr. Rao wrote a report detailing the multiple procedures, inpatient hospital stays and surgeries Plaintiff had undergone, describing them as "intense treatments" requiring "several weeks of recovery" which had left Plaintiff "weakened . . . and unable to work." (R. 814-15.) Dr. Rao expected that Plaintiff would be unable to work until at least September 2017 because barring any complications, Plaintiff would continue chemotherapy until July 2017 and then undergo colostomy reversal surgery. (R. 815.)

4

Plaintiff submitted Dr. Rao's report along with her application for reconsideration of the December 2016 denial of DIB, further explaining that since the resection surgery, she had been in pain and losing weight. (R. 106-07.) On reconsideration in February 2017, the non-examining state agency medical consultant's opinion appears inconclusive, asking: "With this third round of therapy starting, would this meet any part of listing 13.18? Please advise;" however, the opinion states that Plaintiff could perform medium work. (R. 111-12, 115.) The March 2017 opinion of the non-examining state agency mental health consultant found Plaintiff's major depressive disorder was a severe impairment but that it did not meet the 12-month duration requirement. (R. 113-14.)

On February 21, 2017, Plaintiff again complained of multiple side effects from chemotherapy (R. 1119), and on February 27, she was "debilitated" from a cold, cough and fever could not come in for chemotherapy. (R. 868.) On March 7, Plaintiff's mood and appetite were better, but she continued to have "[p]roblems with the ostomy. She still gets perineal pain and no stool per anum." (*Id*.) On March 20, Plaintiff had a dry, itchy rash on her hands and face but her abdominal pain was better. (*Id*.) The next day, Plaintiff told Ms. Schwartz that she was feeling increasingly hopeless and helpless; she was "becoming very frustrated with her chemo treatments and her intense side effects," and she felt "like a machine, not a person anymore due to her cancer treatments." (R. 1121.) Plaintiff reported being noncompliant with her medications. (*Id*.)

On April 3, Plaintiff told Dr. Rao that her dosage of Zofran (anti-nausea drug) was not adequate because she was still nauseous; she also had "[p]ain and [the] urge to defecate" and a tendency to constipation. (R. 869, 899.) Dr. Rao observed that Plaintiff had normal gait and no sensory problems, although Plaintiff reported dizziness on one occasion. (*Id*.) On April 18, Dr. Rao noted Plaintiff had "no pain issues" but she did have mild epigastric tenderness and paresthesia was present. (R. 894-95.) Plaintiff had no sensory or motor deficits and normal gait. (*Id*.)

5

On May 1, 2017, Dr. Rao noted that Plaintiff was "finding it harder to cope. Sometimes the paresthesia is severe and the hands feel cold. Slight loss of balance." (R. 869.) On May 16, Dr. Rao noted that Plaintiff was "having a hard time with chemotherapy and has lost weight. Her energy level is low and she may opt to stop after this cycle. She has a metallic taste in her mouth and the ostomy is getting harder to accept." (R. 889.) On May 30, Plaintiff was doing better with chemo but "social stressors and fatigue as well as dealing with the ostomy [got] to her." (R. 879.)

On June 13, Dr. Rao added a diagnosis of drug-induced polyneuropathy to Plaintiff's list of diagnoses. (R. 872.) Dr. Rao wrote that Plaintiff had paresthesia, or subjective sensory loss, in both feet and had reported that her balance was off; examination still showed normal gait, no areas of weakness or numbness, and a Romberg test (measuring balance) was negative. (R. 874-75.) By early July 2017, Plaintiff had received her last cycle of chemotherapy. (R. 871, 1224.)

In August 2017, Plaintiff began treatment with a social worker, Noel Bueno, LCSW. (R. 1200.) Mr. Bueno noted Plaintiff was still taking Wellbutrin and continued to receive 10 hours per week of assistance with meal prep, shopping, household chores and transportation. (*Id*.) Plaintiff reported that she "feel[s] depressed all the time and do[es]n't have any motivation to do things;" Mr. Bueno opined that her moderate major depressive disorder was "worse." (R. 1200-01.)

On August 31, Plaintiff was admitted to the hospital for a colostomy reversal and resection of her rectosigmoid. (R. 1142.) She was discharged on September 6, once her pain and bowel movements were under control with medication. (R. 1131-34, 1139.) On September 19, Dr. Rao noted that Plaintiff was healing well after the surgery, but her balance was off and her paresthesia with tingling was worse, causing her "issues with dropping objects and balance," which "left her very depressed and tearful." (R. 1224-25.) Examination showed no motor deficits, normal gait and intact cranial nerves, but also sensory loss and a positive Romberg's test. (R. 1225.) Dr. Rao noted

Plaintiff was unsteady and nervous, which made her neuropathy more problematic. (*Id.*) On September 21, Dr. Rao filled out a form indicating that since the letter she wrote in February 2017, Plaintiff had not recovered sufficiently from her treatment and symptoms to return to full time work. (R. 902.) Dr. Rao circled the following symptoms that Plaintiff still experienced: fatigue, pain, mental fogginess and neuropathy in her feet and hands. (*Id.*)

On October 4, 2017, Plaintiff had a post-operative appointment. She reported intermittent constipation alternating with loose stool, and she was taking diphenoxylate (for severe diarrhea).[7] (R. 1128.) Plaintiff complained of increased generalized tiredness and fatigue. (R. 1129-30.)

## II. Evidentiary Hearing Before the ALJ

On October 12, 2017, Plaintiff testified that her hands were numb but sensitive; at the hearing, she sat on her hands because they were "irritating" her. (R. 65, 80.) She had to use two hands to pick up a cup of coffee so it would not drop. (R. 81.) Plaintiff also had numbness in her feet, which "fe[lt] like [her] toes are glued together." (R. 65.) She did not drive because she sometimes did not know which pedal her foot was on. (R. 79-80.) She used a chair in the shower because she loses her balance. (R. 81.) Plaintiff testified that after her granddaughter left for school in the morning, she mostly sat around or napped. (R. 71-72.) Her aide cooked, cleaned and did laundry, and either the aide or Plaintiff's son went grocery shopping. (R. 71-72, 79-80.)

Plaintiff testified that the colostomy bag had been a "nightmare;" it leaked without warning and would "mess up" her bed or her clothes. (R. 78, 82.) She continued to have intermittent stomach and rectal pain since her colostomy reversal; when she tried to have a bowel movement, her rectal pain could reach a level of nine out of 10, and her abdominal pain was a seven or eight out of 10. (R. 66-69.) She put a warm towel on her stomach to ease her pain; she was scared to

---

[7] https://www.mayoclinic.org/drugs-supplements/diphenoxylate-and-atropine-oral-route/description/drg-20061751.

take Norco because it caused constipation and knocked her out, and she already had bowel trouble and lacked energy to do things. (R. 68, 73-74.) She did not take the medication Dr. Rao prescribed for numbness because the pharmacist told her it was for seizures, which she did not have. (R. 69-70.)

The ALJ presented the vocational expert ("VE") with various hypotheticals, including an individual who could perform light work with the following limitations: frequent foot controls, hand controls, handling, fingering, and feeling; occasional ramps and stairs, balancing, stooping, kneeling, crouching and crawling; and no ladders, ropes, scaffolds, unprotected heights, moving mechanical parts, or operation of motor vehicles. (R. 88.) The VE testified that the individual could perform Plaintiff's past work as a daycare center director. (*Id.*) However, past work would not be available if the individual was limited to simple, routine tasks and simple work-related decisions or if the individual was limited to occasional hand controls, foot controls, handling, fingering and feeling. (R. 88, 91-92.) In addition, more than once absence per month or unscheduled bathroom breaks for more than five minutes each hour, would preclude all work. (R. 93-94.)

After the hearing, the ALJ admitted into evidence a report from Dr. Rao dated October 26, 2017. The report included a referral for physical therapy to evaluate and treat Plaintiff's "general weakness" of her upper extremities and "loss of balance" since receiving chemotherapy. (R. 1227.)

### III. ALJ's Decision

On May 22, 2018, the ALJ issued an opinion finding Plaintiff had not been under a disability, as defined in the Social Security Act, from her alleged onset date of April 1, 2016, through the date of the decision, meaning that Plaintiff did not have an impairment or combination of impairments "that has lasted or can be expected to last for a continuous period of not less than 12 months." (R. 123.) The ALJ found Plaintiff's colon cancer was a severe impairment but that

8

her depression and anxiety were not severe because they resulted in no more than mild limitations in the paragraph B categories of understanding, remembering or applying information; interacting with others; maintaining concentration, persistence, or pace; and adapting and managing oneself. (R. 125-26.) The ALJ acknowledged Plaintiff "displayed an irritable and depressed mood" during counseling sessions but noted that she was "the primary caretaker for her granddaughter and can perform activities of daily living independently," and she "consistently had intact orientation, fair eye contact, coherent and logical speech, normal memory, normal thought content, cooperative attitude, fair judgment and insight, and intact attention and concentration." (R. 126.) The ALJ concluded that her impairments, alone or in combination, did not meet a listing. (R. 126-27.)

The ALJ assigned Plaintiff a residual functional capacity ("RFC") to perform light work limited to: frequent operation of foot and hand controls; frequent handling, fingering, and feeling; occasional ramps, stairs, balancing, stooping, kneeling, crouching and crawling; no climbing ladders, ropes or scaffolds; no working at unprotected heights or around moving mechanical parts; and no operating motor vehicles. (R. 127.) The ALJ reviewed Plaintiff's hearing testimony and her function reports as well as the medical evidence and determined that although Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, "her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record." (R. 127-28.)

In reviewing the medical evidence, the ALJ wrote that Plaintiff "began to complain of abdominal pain and rectal bleeding" in June 2016, "shortly after her alleged onset date," and that "despite her diagnosis" of rectal cancer, she "had otherwise normal physical findings, including intact sensation, motor function, gait, and cranial nerves." (R. 128.) In addition, at the time of Plaintiff's resection surgery in December 2016, the ALJ wrote that Plaintiff "endorsed general

9

fatigue, but she had normal neurological findings." (*Id*.) The ALJ acknowledged Plaintiff's complaints of pain, poor appetite, weight loss, and depression in February 2017, and her complaints of increased fatigue and stress and paresthesia in her hands in May, June and July 2017, but noted that in March and April 2017, Plaintiff denied pain and was gaining weight. (*Id*.) Furthermore, the ALJ noted that despite Plaintiff "endors[ing] neuropathy in August and September 2017, on examination, she had normal gait, intact cranial nerves, and intact sensation," she reported "doing well following her colostomy reversal," and "in October 2017, she only had minimal tenderness and she denied any complaints besides intermittent constipation." (*Id*.)

The ALJ concluded that Plaintiff:

> underwent nearly a year of treatment for her rectal cancer, which involved surgery, radiation, and chemotherapy. However, the treatment was successful and by July 2017, the claimant was able to undergo colostomy reversal. Furthermore, the claimant has otherwise maintained generally normal physical findings, including normal gait, intact cranial nerves, and intact sensation. Nevertheless, considering the claimant's complaints of neuropathy, joint pain, and fatigue, . . . the claimant is limited to a reduced range of light work . . . The claimant's otherwise normal physical findings demonstrate that she does not have additional limitations.

(R. 128-29.) The ALJ also stated that "there is no objective indication of numbness in her extremities or pain that would render her unable to perform" light work and found Plaintiff's claim to have "pain that reached 9/10 . . . is not supported by the record as there is very little in her recent oncology treatment notes to indicate pain of this intensity." (R. 129.) The ALJ acknowledged that Plaintiff "complains about dropping things," but blamed that on Plaintiff's failure to take her prescribed medicine for numbness. (*Id*.) In addition, the ALJ noted that Plaintiff had been referred to physical therapy for "general weakness" but found that there was "no suggestion that the condition would not improve with physical therapy." (*Id*.) Moreover, the ALJ found "no objective indication of cognitive deficits or persistent claims of fatigue after June 2017." (*Id*.)

The ALJ gave little weight to Dr. Rao's opinions from February and September 2017, finding them "conclusory" on the question of disability, which is "reserved for the Commissioner," and finding that "Dr. Rao did not opine to any specific functional limitations." (R. 129.) The ALJ also gave little weight to the state agency opinions because "additional evidence received at the hearing level" showed Plaintiff had severe impairments that limited her to a range of light work. (*Id.*) Ultimately, the ALJ found that Plaintiff could perform her past work as a daycare center director as actually performed (at the light level), and thus she was not disabled under the Social Security Act from April 1, 2016, through the date of the decision. (R. 130.)

## ANALYSIS

Plaintiff contends that the ALJ's decision was not supported by substantial evidence on several grounds. (D.E. 19: Pl.'s Mem. in Supp. of Remand.) For the reasons that follow, the Court agrees.

**I.      Legal Standard**

An ALJ's decision will be affirmed if it was supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. In making this determination, "[w]e will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal quotations omitted).

11

**II.    The ALJ's Assessment of Dr. Rao's Opinion Was Not Supported by Substantial Evidence.**

A treating physician's opinion is entitled "to controlling weight unless the ALJ provided 'good reasons' for affording it less weight." *Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021). For claims filed before March 27, 2017, as Plaintiff's claim was, Section 404.1527(c) of the Social Security regulations provides that if an ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider the following factors in deciding what weight to give the physician's opinion: the length, nature, and extent of the treating relationship; the opinion's supporting explanation and consistency with other evidence; and any specialty of the physician. 20 C.F.R. § 404.1527(c). "An ALJ is required to consider findings that support a treating doctor's opinion; failure to do so is error." *Hardy v. Berryhill*, 908 F.3d 309, 312 (7th Cir. 2018).

The ALJ's discussion of Plaintiff's treating oncologist was limited to the following:

> Leela N. Rao, M.D. opined that the claimant could not perform full time work. (22F; 28F) The undersigned affords Dr. Rao's opinion little weight. Dr. Rao's opinion is conclusory and the question as to whether the claimant is disabled is one reserved for the Commissioner. Moreover, Dr. Rao did not opine to any specific functional limitations. Therefore, her opinion is afforded little weight.

(R. 129.) The Commissioner admits the ALJ failed to consider most of the required factors but contends that the ALJ's discussion was adequate because it considered "the supportability of Dr. Rao's opinions," in finding "Dr. Rao's pronouncements unsupported by objective evidence and thus conclusory, an important factor." (D.E. 27: Gov. Resp. at 8.) The Court disagrees.

Even applying the most deferential and generous "minimal articulation" standard, the ALJ's scant articulation of her reasons for giving Dr. Rao's opinion little weight does not meet the substantial evidence standard. Despite finding (as she must) that Plaintiff's rectal cancer was a severe impairment, the ALJ omitted any discussion of the fact that Dr. Rao was Plaintiff's treating

12

oncologist, the doctor who coordinated all of her cancer treatment from July 2016 through September 2017, including chemoradiation, chemotherapy and multiple surgeries. This error alone demonstrates that "the evidence to support the ALJ's determination is less than substantial." *Reinaas v. Saul*, 953 F.3d 461, 466 (7th Cir. 2020) (holding that "[i]n light of [the doctor's] specialty and treatment relationship with [the claimant], the evidence to support the ALJ's determination [was] less than substantial.")

Moreover, contrary to the Commissioner's claims, the ALJ did *not* consider the supportability of Dr. Rao's opinions. While the ALJ is correct that the ultimate question of disability is reserved for the Commissioner, the ALJ may not simply "disregard[]" a doctor's "statement because the doctor mentioned ability to work, which is an issue reserved for the agency." *Mandrell v. Kijakazi*, 25 F.4th 514, 517 (7th Cir. 2022). "An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider 'all relevant evidence.'" *Id*. Dr. Rao's opinions were far from conclusory and were in fact supported by objective evidence, including significant evidence that the ALJ ignored. Dr. Rao's own reports documented that Plaintiff spent days in the hospital and needed weeks to recover from radiation, chemotherapy, diverting colostomy surgery, surgical resection of the rectum, chemotherapy, and colostomy reversal surgery, during which she suffered pain, nausea, vomiting, bowel obstruction, weight loss and weakness, and from which she continued to experience symptoms of fatigue, pain, mental fogginess and neuropathy in her hands and feet as late as September 2017. (R. 902-03, 1018-19.)

### III. The ALJ Assigned an RFC That Was Not Supported by Substantial Evidence.

In addition to giving little weight to Dr. Rao's opinions, the ALJ gave little weight to the state agency opinions, which begs the question: on what basis did the ALJ create Plaintiff's RFC?

13

As the Commissioner explains, it was "the ALJ's responsibility to determine plaintiff's RFC, based on all of the available relevant evidence." (Gov. Mem. at 10.) However, the ALJ here improperly "ignore[d] entire swaths of [evidence] that point toward a finding of disability," *Lothridge v. Saul*, 984 F.3d 1227, 1233-34 (7th Cir. 2021), and "cherry-pick[ed] facts supporting a finding of non-disability." *Reinaas*, 953 F.3d at 466. First, the ALJ ignored the severe symptoms associated with Plaintiff's initial diagnosis of cancer in June 2016, because at the time, Plaintiff "had otherwise normal physical findings, including intact sensation, motor function, gait, and cranial nerves." (R. 128.) Second, the ALJ overlooked the extended hospitalization, recovery time and associated pain and other symptoms at the time of Plaintiff's resection surgery in December 2016, because the ALJ found that "she had normal neurological findings." (*Id.*) Third, the ALJ minimized Plaintiff's complaints of pain, poor appetite, weight loss, depression, fatigue, stress, paresthesia and neuropathy in February 2017 and May through September 2017, because Plaintiff continued to have "normal gait, intact cranial nerves, and intact sensation," and she denied pain and weight loss in March and April 2017. (*Id.*)

But "[t]he connection between those [normal] characteristics and [Plaintiff's] alleged [limitations] is nowhere explained." *Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) (reversing and remanding where the ALJ relied on records from treatment the claimant received for a staph infection and notes that the claimant's extremities were not fractured, tender, or swollen that were "irrelevant" to the claimant's alleged pain and restricted mobility). The ALJ does not explain – nor is it self-evident – how intact sensation, normal gait and full motor function are relevant to Plaintiff's multiple hospitalizations, surgical recovery time, pain, poor appetite, weight loss, depression, fatigue, stress, paresthesia, neuropathy, severe diarrhea and constipation. The ALJ's reliance on notes "reflect[ing] essentially normal physical exams" does not constitute substantial

14

evidence of non-disability where "it is not clear how these findings undermine [the claimant's] claim of disability." *Hardy*, 908 F.3d at 312.

Moreover, while the ALJ's opinion perfunctorily states that she "consider[ed] the claimant's complaints of neuropathy, joint pain, and fatigue" in limiting Plaintiff "to a reduced range of light work" (R. 128-29), the ALJ's opinion gives no indication of why and on what basis she assigned the reduced range of work that she did, specifically, frequent handling, fingering, feeling, and operation of foot and hand controls, as opposed to always or never, or occasionally, which the VE testified would preclude Plaintiff's past work. (R. 88, 91-92.)[8] It is not, as the Commissioner claims, "plaintiff's burden to prove she could not" perform full-time work at the RFC level the ALJ assigned. (Gov. Mem. at 5.) It is Plaintiff's "burden to prove she is disabled by producing medical evidence." *Gedatus*, 994 F.3d at 905. Plaintiff has produced abundant evidence. The problem is that "the ALJ did not adequately connect the dots between the RFC [s]he found and the deficits that [s]he also acknowledged" with her "cursory analysis of symptoms" and "selective discussion of the evidence." *Mandrell*, 25 F.4th at 518-19. In other words, the ALJ failed "to provide a 'logical bridge' between the evidence and [her] conclusions." *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022).

IV. **The ALJ Misconstrued the Length and Breadth of Plaintiff's Cancer Treatments**.

In addition, the ALJ's statements that Plaintiff "*began* to complain of abdominal pain and rectal bleeding" in June 2016 and "underwent *nearly a year of treatment* for her rectal cancer, which involved surgery, radiation, and chemotherapy" misconstrues the evidence. (R. 128-29, emphasis added.) The evidence is uncontradicted that Plaintiff first went to the ER suffering from

---

[8] "Occasionally" means occurring up to one-third of a workday, while "frequent" means occurring up to two-thirds of the workday. SSR 83-10, https://www.ssa.gov/OP_Home/rulings/di/02/SSR83-10-di-02.html.

15

severe abdominal pain in March 2015 (R. 464-67, 474), and that over the next year she suffered from abdominal pain and constipation alternating with diarrhea and blood in her stool, but she had been unable to pursue treatment because she had lost her health insurance and she was the primary caregiver for her granddaughter. (R. 1161-63.) By the time Plaintiff was finally able to return to the ER in June 2016, there was a mass in her rectum so large that the endoscope could not pass beyond the mass. (R. 1148; 1160-61.) The treatment for her cancer began the following month and lasted through September 6, 2017, when Plaintiff was discharged after a one-week inpatient stay at the hospital for surgery for colostomy reversal and resection of her rectosigmoid. This treatment period by itself lasted more than the minimum 12-month period required to show disability. On remand, the ALJ should carefully consider the correct onset and duration of any of Plaintiff's limitations.[9]

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion to remand (D.E. 19) and denies the Commissioner's motion to affirm (D.E. 26). The Court denies Plaintiff's request for a directed finding of disability.

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: May 23, 2022**

---

[9] In addition, on remand the ALJ should return to the issue of Plaintiff's credibility because the ALJ's statement that Plaintiff "can perform activities of daily living independently" (R. 126) ignores the weekly help Plaintiff received from an aide and her children.